ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of -- ) | |
| ) | |
| Fluor Federal Solutions, LLC ) | ASBCA No. 61093 |
| ) | |
| Under Contract No. N69450-12-D-7582 ) | |

APPEARANCES FOR THE APPELLANT:       John S. Pachter, Esq.
                                     Gregory A. Smith, Esq.
                                     Jennifer A. Mahar, Esq.
                                     Kathryn T. Muldoon Griffin, Esq.
                                      Smith Pachter McWhorter PLC
                                     Tysons Corner, VA

APPEARANCES FOR THE GOVERNMENT:      Craig D. Jensen, Esq.
                                      Navy Chief Trial Attorney
                                     Russell A. Shultis, Esq
                                     Julie Ruggieri, Esq.
                                     Trial Attorneys

OPINION BY ADMINISTRATIVE JUDGE CLARKE
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

Fluor Federal Solutions, LLC (Fluor) appeals the Navy's decision to require Fluor to provide onsite manning at the Naval Station Mayport Water Treatment Plant 24 hours per day, 7 days per week. Both parties have moved for summary judgment. Fluor asks the Board to find the Navy's interpretation to be unreasonable and order the Navy to compensate it $934,426.47 for amounts withheld and operating costs. The Navy contends that the Contract clearly required 24/7 manning. We have jurisdiction pursuant to the Contract Disputes Act of 1978 (CDA), 41 U.S.C. §§ 7101-7109. In accordance with the decision below, we sustain the appeal.

STATEMENT OF FACTS (SOF) FOR THE PURPOSES OF THE MOTIONS

*FDEP Permit No. 0146801-012-WC*

1. Florida Department of Environmental Protection (FDEP) issued Permit No. 0146801-012-WC, dated November 6, 2006, to Navy Public Works Center Jacksonville; it includes the following:

> Enclosed is permit 0146801-012-WC, dated November 6,
> 2006, to convert from gaseous chlorine disinfection to

liquid sodium hypochlorite. This permit is issued pursuant
to Section(s) 403.087, Florida Statutes (F.S.).

....

This permit is issued under the provisions of Chapter 403,
Florida Statutes (F.S.), and Florida Administrative Code
(F.A.C.) Chapter 62-555 (formerly 17-22). The above
named Permittee is hereby authorized to perform the work
or operate the facility shown on the application and
approved drawing(s), plans, and other documents attached
hereto or on file with the Department and made a part
hereof and specifically described as follows:

Description: Conversion from gaseous chlorine disinfection
to liquid sodium hypochlorite [hypochlorination]. The
system will have two 2500 gallon storage tanks with room
for more, three chemical feed pumps at 30 gph each and a
new chlorine analyzer. The permitted maximum capacity of
the plant will remain at 5.7 MGD.

(App. supp. R4, tab 222 at 1, 3[1]) Permit "Specific Condition" No. 9 states that the
permittee (Navy Public Works Center Jacksonville) "shall follow the guidelines of
Chapters 62-550, 62-555, and 62-560, [FL Admin Code], regarding public drinking
water system standards, monitoring, reporting, permitting, construction, and operation."
(App. supp. R4, tab 222 at 9) The permit had an expiration date of November 5, 2011
(*id.*). The permit requires that the project "shall be completed prior to the expiration date
of this permit" (*id.* at 10).

*Requests for Information Nos. 243 and 550*

2. During the solicitation period, potential bidders submitted Requests for
Information (RFI) to the Navy. In RFI No. 243, a potential bidder cited Spec. Items 3.1
and 3.1.5 and asked whether water treatment plants (WTP) "require 24 hr/7 day a week
staffing" and that "watchstanding" be defined. The Navy responded: "Permits determine
staffing. Permits and requirements for compliance are given by the Florida Department of
Environmental Protection (FDEP). Water Permits are available from FDEP." (App. supp.
R4, tab 204 at 7)

3. In RFI No. 550 a potential bidder cited Spec. Items 3.1 and 3.1.5 and asked
"Do WTP's require 24 hr/7 day a week staffing? Define 'watch-standing.'" The Navy

---

[1] Page numbers refer to PDF page numbers.

responded "Water Treatment Plants are to be addended [sic] per the CUP Permit #589 and #829. 'Watch Standing' is the required attendance per the CUP permit." (App. supp. R4, tab 205 at 26)

4. "CUP" stands for "Consumptive Use Permit" (app. supp. R4, tabs 232, 238). CUP Permit No. 829, February 8, 2000, was issued to U.S. Navy, FISC Fuel Depot and authorizes withdrawal of 8.640 million gallons of water daily from the St. Johns River for fire protection (app. supp. R4, tab 232 at 2-3, 5). CUP Permit No. 589, August 14, 2012, was issued to Naval Stayton Mayport and authorizes the use of 547.50 million gallons per year from the Floridian aquifer and Lake Wonderwood for commercial/industrial and irrigation purposes (app. supp. R4, tab 238 at 2). We found nothing in these two permits that deals with the manning of the Mayport WTP or "watch standing."

*Contract No. N69450-12-D-7582*

5. The Navy awarded Fluor Contract No. N69450-12-D-7582 (Contract 7582) on December 13, 2011. The $40,356,783.00 Contract required Fluor to provide base operations support services at four Navy installations near Jacksonville, Florida, including Naval Station (NS) Mayport. (R4, tab 1.3) Fluor's final proposals[2] were incorporated into Contract 7582 (*id.* at 2). As awarded, the Contract provided for a base period of one year, four one-year option periods, and three one-year award option periods, not to exceed a total of ninety-six months (*id.* at 11).

6. Pursuant to contract requirements, Fluor maintained and supported, among other Navy assets, the NS Mayport WTP (app. supp. R4, tab 201 at 1). The contract was a "performance-based contract" (R4, tab 1.3 at 13). Section C of the Contract included separate "Annexes" for each site. The Annexes set forth the Performance Work Statement (PWS) or "performance-based specifications," organized by Specification Item (Spec. Item). (*Id.*)

7. The contract incorporates Federal Acquisition Regulation (FAR) 5252.246-9303 CONSEQUENCES OF CONTRACTOR'S FAILURE TO PERFORM REQUIRED SERVICES (OCT 2004) that includes:

> (d) When WATCHSTANDING SERVICES apply. If the
> Contractor fails to provide qualified personnel or allows
> any post to be unmanned for a total of <u>10</u> minutes in any

---

[2] We do not discuss Fluor's proposal because we reject the Navy's argument that Fluor's proposal indicated it agreed to 24/7 manning.

3

shift, the Government may assign other persons to perform such work or withhold payment as specified below.

(R4, tab 1.3 at 16)

*Annex 1606000 - Water*

8. Contract Section C, NS Mayport Annex 1606000 - Water, Spec. Item 3.1 Operation, included a table with columns "Title," "Performance Objective," "Related Information," and "Performance Standard." The performance objective required operation of the WTP so as to provide potable water "24 hours per day, seven days per week, throughout the contract period." (App. supp. R4, tab 201 at 5) The "Related Information" read in part:

> Operation consists of "watch-standing" or attendance type work by a sufficient staff of qualified persons during a specified time period to ensure safe, reliable, efficient production and distribution of potable water.
>
> ....
>
> Safe operation shall ensure that all Water Treatment Plant equipment requiring operator attendance is staffed by qualified personnel at all times of operation.

(*Id.*) The Performance Standard required that WTP systems be efficiently, safely, and continuously operated per operation criteria to meet demand requirements 99.5% of the time annually (*id.*).

9. Contract Section C, NS Mayport Annex 1606000, Spec. Item 3.1.5, addressed "Minimum Operator Attendance" for the NS Mayport WTP (app. supp. R4, tab 201 at 8-9). Spec. Item 3.1.5 "Performance Objective" required Fluor to provide the following:

> The Contractor shall provide water treatment plant operators and support personnel in sufficient quantities of staffing per shift to efficiently and safely operate equipment at all times of operation, 24 hours per day, seven days per week, throughout the contract period.

(App. supp. R4, tab 201 at 8-9) Spec. Item 3.1.5 "Performance Standard" further required as follows:

Minimum numbers and types of water treatment plant operators, support personnel, and supervisory operators in direct responsible charge comply, by each applicable shift, with operating permit, approved SOP, and Maintenance Manual.

(App. supp. R4, tab 201 at 8-9)

10. Spec. Item 3.1.6, Operating Records, Logs, Reports and Procedures, includes Performance Objective as follows:

The Contractor shall prepare, submit and maintain operating records, logs and reports for in-process tracking of plant output characteristics.

(App. supp. R4. tab 201 at 9) Spec. Item 3.1.6 Related Information reads in part:

The Contractor shall prepare, and submit operating records, logs and reports for in-process tracking of plant output characteristics per approved operating permit, LANTNAVFACENGCOMINST 11300.4, approved SOP and UFC. The monthly Operating Records Report shall be submitted to the KO within 3 working days following the end of the month during which work is performed and shall include copies of daily operating logs, chemical content, pressure readings, chemical dosages, filter backwash frequencies, flow rates, and other laboratory records, maintenance records, corrosion tests, *personnel records,* emergency condition records, and operating costs.

(App. supp. R4, tab 201 at 9) (Emphasis added) Spec. Item 3.1.6, Performance Standard requires that records, logs, reports and procedures be current and complete (*id.*).

*Florida Administrative Code*

11. As discussed above, the Florida Administrative Code is referenced in the FDEP Construction Permit. "Fla. Admin. Code § 62-555.350(8) requires that "suppliers of water" "employ licensed operation personnel in accordance with Chapters 62-602 and 62-699, F.A.C., for all public water systems." Florida Administrative Code § 62-550.200(105) states, "'Supplier of Water' means any person who owns or operates a public water system." (Gov't December 20, 2018 resp. to mot. at 5 ¶ 14)

5

12.  Florida Administrative Code § 62-699.310 applies to all suppliers of water (except in circumstances not present here) and establishes onsite manning requirements for operating water treatment plants in Florida.  The manning requirements are governed by a water treatment plant's "Category" and "Class."  The regulations specify that a plant's "treatment processes" determine the Category; and the plant's "permitted maximum day operating capacity" determines the Class. Florida Administrative Code § 62-699.310(e). (Gov't December 20, 2018 resp. to mot. at 5-6 ¶ 15)

13.  Under Florida Administrative Code § 62-699.310(e), the NS Mayport Water Treatment Plant is a Category V, Class C facility because it employs hypochlorination and the Plant's "permitted maximum capacity" is greater than 5.0 MGD (app. supp. R4, tab 223 at 2).

14.  Florida Administrative Code § 62-699.310(e), specifies that Category V, Class C facilities with a permitted maximum capacity greater than 5.0 MGD – such as the NS Mayport WTP – require "[s]taffing by Class C or higher operator: 6 hours/day for 5 days/week and one visit on each weekend day" (app. supp. R4, tab 223 at 2).

*Operational Log*

15.  Fluor included in the record a copy of its August 2014 WTP operational log submitted in accordance with Spec Item 3.1.6, Annex 1606000 (app. supp. R4, tab 224). The entries indicate that work was being performed typically between 0630 and 1700 every day of the month of August 2014 (*id.*).

*Customer Complaint Record & Withholding Payments*

16.  On December 19, 2014, the Navy issued a "Customer Complaint Record" asserting that Spec. Item 3.1.5 required 24/7 manning of the WTP:

> **DETAILS OF COMPLAINT:**
>
> ....
>
> FLUOR failed to operate and maintain NS Mayport's Water Treatment Plant in compliance with the contract. The plant is only operated 8 hours out of the day and unmanned for 16 hours.
>
> **PAR COMMENTS:**
>
> Checked and verified the hours that Bldg. 1907 is physically manned and found that it is only manned from

6

0700-1500 7 days a week. The contact [sic] specifically states that..

Spec 3.1.5 "The Contractor shall provide water treatment plant operators and support personnel in sufficient quantities of staffing per shift to efficiently and safely operate equipment at all times of operation, 24 hours per day, seven days per week, throughout the contract period." The contractor has failed to meet the contract requirements of Annex 1606000 Spec Item 3.1.5.

(App. supp. R4, tab 225)

17. By letters dated May 19, 2015, June 11, 2015, and July 23, 2015, the contracting officer notified Fluor that the Navy was withholding payment from Fluor's March, April, and May 2015 invoices because of various failures listed in each letter. One of the failures was that Fluor had not provided 24/7 manning, citing noncompliance with Spec. Item 3.1.5. (App. supp. R4, tabs 210-211, 228)

18. By email dated June 17, 2015, the contracting officer again asserted that Spec. Item 3.1.5 required 24/7 manning:

1606000 3.1.5 Minimum Operator Attendance: The withholding amount of $89,941.40 is based on the hours that Fluor did not provide 24 hour staffing of the Water Treatment Plant as required by 3.1.5 Minimum Operator Attendance for a period of 9 months, July 2014-March 2015.
April's [2015] Withholdings are based on the same as above, but on a monthly basis....

(App. supp. R4, tab 227 at 1)

*Contractor Performance Assessment Report (CPAR) & Contractor Discrepancy Report (CDR)*

19. On May 26, 2015, the Navy issued an interim Contractor Performance Assessment Report ("CPAR") for the first six months of "Option Year 2," *i.e.*, July 1 - December 31, 2014. In the CPAR, the Navy asserted Fluor's "Performance does not meet some contractual requirements," because, in part, the "Plant was only manned 8 hours and left unmanned 16 hours each day." (App. supp. R4, tab 226 at 1-2, 6)

20. On July 24, 2015, the contracting officer issued Contractor Discrepancy Report (CDR) C063 in which she asserted that Fluor "failed to operate and maintain

7

NS Mayport's Water Treatment Plant in compliance with the contract." According to the Navy, Fluor's staffing of the Plant fourteen hours per day was insufficient because the Contract requires 24/7 manning. (App. supp. R4, tab 212 at 1)

21. By letters dated August 3, 2015 and August 14, 2015, Fluor responded to CDR C063, stating that the Contract did not require 24/7 manning while asserting that Fluor's staffing of the NS Mayport WTP complied with the contract requirements (app. supp. R4, tabs 213-14).

*Fluor Increases WTP Manning to 24/7*

22. To avoid further Navy withholdings and negative evaluations, beginning on September 1, 2015, Fluor increased staffing to provide 24/7 manning of the WTP (gov't December 20, 2018 resp. and cross mot. at 9 ¶ 25; app. supp. R4, tab 229).

*Contract Modification No. P00160*

23. On September 28, 2015, the Navy issued unilateral contract Modification No. P00160 to deduct $283,849.47 from the contract value for alleged non-compliance with 24/7 manning. The modification stated:

> b. Non-compliance with manning requirements in accordance with NS Mayport Annex 1606000, Specification Item 3.1.5 Contractor Minimum Attendance. The deductions assessed are for the period of 1 July 2014 through 31 August 2015 in the amount of $283,849.47.

(R4, tab 2 at 160)

24. On January 19, 2016, the Navy issued its final CPAR for Option Year 2 and asserted that during January 1 2015 - June 30, 2015, Fluor had "not met some contractual requirements" because it did not provide 24/7 manning, among other failures (app. supp. R4, tab 215 at 2-3).

25. In its February 2, 2016, response to the final CPAR, Fluor again stated its understanding that the Contract did not require 24/7 manning:

> The Mayport Water contract requires water treatment plant operators and support personnel in sufficient quantities of staffing per shift to efficiently and safely operate equipment at all times of operation, 24 hours per day, seven days per week, throughout the contract period, which requirement was clarified in the Q&A as staffing in

8

accordance with permit requirements. Fluor met the contractual and permit requirement.

(App. supp. R4, tab 216 at 5)

26. On May 5, 2016, the Navy issued its interim CPAR for "Option Year 3" and again asserted that during July 1, 2015 – December 31, 2015, Fluor had "not [met] some contractual requirements" because it did not provide 24/7 manning (app. supp. R4, tab 230 at 1-3).

27. In its May 20, 2016 response to the interim CPAR, Fluor repeated its objections to the Navy's 24/7 manning requirement (app. supp. R4, tab 231 at 6).

*Certified Claim*

28. On July 27, 2016, Fluor submitted a certified claim demanding return of the amounts deducted via Modification No. P00160, compensation for additional costs already incurred for 24/7 manning of the Plant, and revision of the CPARs for Option Years 2 and 3 (R4, tab 3). Fluor also requested that the Navy "retract its requirement to man the NS Mayport Water Treatment Plant 24/7 going forward" and provide an equitable adjustment for the extra costs associated with 24/7 manning in the amount of $934,426.47 (*id.* at 1).

29. On December 15, 2016, the Navy issued a contracting officer final decision (COFD), denying Fluor's claim (R4, tab 4). Fluor filed an appeal with the ASBCA on March 13, 2017. The ASBCA docketed the appeal as ASBCA No. 61093 on March 14, 2017.

## DECISION

*Legal Standard for Summary Judgment*

We evaluate the cross-motions for summary judgment under the well-settled standard: Summary judgment is properly granted only where there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. The moving party bears the burden of establishing the absence of any genuine issue of material fact and all significant doubt over factual issues must be resolved in favor of the party opposing summary judgment. *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390 (Fed. Cir. 1987) (citations omitted). In the course of the Board's evaluation of a motion for summary judgment, our role is not "'to weigh the evidence and determine the truth of the matter,' but rather to ascertain whether material facts are disputed and whether there exists any genuine issue for trial." *Holmes & Narver Constructors, Inc.*, ASBCA Nos. 52429, 52551, 02-1 BCA ¶ 31,849 at 157,393

9

(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). A material fact is one which may make a difference in the outcome of the case. *Liberty Lobby*, 477 U.S. at 248. The opposing party must assert facts sufficient to show a dispute of material fact. *New Iraq Ahd Co.*, ASBCA No. 59304, 15-1 BCA ¶ 35,849 at 175,291-92 (citing *Mingus*, 812 F.2d at 1390-91) ("To ward off summary judgment, the non-moving party must do more than make mere allegations; it must assert facts sufficient to show a dispute of material fact."); *see Lee's Ford Dock. Inc.*, ASBCA No. 59041, 16-1 BCA ¶ 36,298 at 177,010.

*Positions of the Parties*

Fluor contends that nothing in the contract or referenced in the contract requires that Fluor provide 24/7 manning of the Mayport WTP. Fluor points out that the Navy held the same interpretation for the first two and a half years of performance. Fluor contends that two RFI's submitted during the solicitation period and answered by the Navy support its position. Fluor also relies upon FDEP Permit No. 0146801-012-WC and various Florida Administrative Code provisions cited in the permit that it contends support Fluor's position that 24/7 manning is not required. (App. November 19, 2018[3] mot. for partial[4] sum. judgment)

The Navy contends that the contract clearly and unambiguously requires 24/7 manning of the WTP. The Navy relies on the same language of Specification No. 1606000, Spec. Item 3.1.5 that Fluor cites but suggests a different interpretation. The Navy also cites to Spec. Item 3.1 and the requirement for "watch standing" and "operator attendance" in support of its interpretation. The Navy points out that FDEP Permit No. 0146801-012-WC expired on November 5, 2011, before Contract 7582 was awarded. It also argues that the Florida Administrative Code is not "controlling." The Navy also challenges Fluor's assertion that it accepted Fluor's less than 24/7 manning of the WTP for the first two and a half years. (Gov't December 20, 2018 resp.; gov't cross mot.)

*No Disputed Facts that are Material to the issue of Interpretation*

In its response and cross motion, the Navy addresses each of the paragraphs in Fluor's Statement of Undisputed Material Facts (SUMF). It "disputes" a substantial number of Fluor's SUMFs, however, we agree with Fluor that the "disputes" were not over material facts but rather terminology, legal conclusions and the argument that FDEP Permit No. 0146801-012-WC is irrelevant because it expired before Contract 7582 was

---

[3] Because there are five briefs in this case, two Navy and three Fluor, we include the date of the brief to help identify the brief referred to.

[4] "Partial" is a misnomer because granting either motion will fully resolve the entitlement case.

10

awarded. Fluor also addressed the Navy's additional Proposed Material Facts and concludes that the Navy did not "present triable issues of fact." (App. March 1, 2019 reply br. at 12) We agree. We also agree that the Navy's Proposed Material Facts ¶¶ 7-12 itemizing various water quality problems have nothing to do with the contract interpretation issue and are therefore not material disputed facts that would preclude summary judgment (app. March 1, 2019 reply br. at 15). We conclude that this case is appropriate for decision on the parties' cross-motions for summary judgment.

*FDEP Permit No. 0146801-012-WC*

FDEP Permit No. 0146801-012-WC was issued on November 6, 2006, with an expiration date of November 5, 2011 (SOF ¶ 1). The Navy dismisses this permit as irrelevant because it expired before Contract 7582 was awarded (gov't December 20, 2018 resp. to mot. at 5-6). The Navy overlooks the fact that this was a construction permit authorizing the "Conversion from gaseous chlorine disinfection to liquid sodium hypochlorite" (SOF ¶ 1). The permit required construction be completed before its expiration (*id.*). There was no need to renew it after construction was completed. It is, therefore, relevant to the operation of the WTP in that it requires post-construction compliance with Florida Administrative Code sections Chapters 62-550, 62-555, and 62-560. (*Id.*) It was therefore wholly appropriate for Fluor to trace the requirements of these code sections to assist in interpreting the WTP manning requirement of Contract 7582. Fluor correctly points out that these code sections require "[s]taffing by Class C or higher operator: 6 hours/day for 5 days/week and one visit on each weekend day." (SOF ¶¶ 11-14) Suffice it to say that the Florida Administrative Code sections cited in the construction permit do not require 24/7 manning of the WTP (*id.*). This is particularly important because the Navy referred to FDEP permits as the source of manning requirements in its answer to RFI No. 243 (SOF ¶ 2).

*Pre-Award Requests for Information (RFI)*

Before award of Contract 7582 bidders submitted two RFIs that are relevant to our interpretation analysis. Pre-award RFIs/questions and answers (Q&A) are very important because bidders are entitled to rely on the government's answers. The government risks jeopardizing its interpretation arguments by providing inconsistent answers to RFI's.

We have held that pre-bid questions and answers are not "wiped from the record by the formal execution of the contract." *Northwest Marine, Inc.*, ASBCA No. 43502, 94-1 BCA ¶ 26,521 at 131,999 (citing *Sylvania Electric Products, Inc. v. United States*, 458 F.2d 994, 1008 (Ct. Cl. 1972)). In *Metcalf Construction Co. v. United States*, 742 F.3d 984 (Fed. Cir. 2014), the Federal Circuit held that pre-bid questions and answers used by bidders in estimating and submitting bids are highly relevant to the post award interpretation of contract provisions. (*Id.* at 995-97). In earlier decisions we have held

11

the same. *Ogden Allied Services Corp.*, ASBCA No. 40823, 91-1 BCA ¶ 23,455 at 117,671 (appellant has the right to rely on pre-bid questions and answers as to matters of contract interpretation); *Bogue Electric Manufacturing Co.*, ASBCA No. 16958, 74-1 BCA ¶ 10,513 at 49,794 (questions and answers at a pre-bid conference can properly be referred to for the purpose of evaluating the reasonableness of appellant's interpretation). The Court of Federal Claims follows the same law. *Aero Corp., S.A. v. United States*, 38 Fed. Cl. 739, 762 (citing *Sharpe Refrigeration, Inc. v. United States*, 30 Fed. Cl. 735, 739 (1994)) (Official statements made during pre-bid conferences to clarify contract language should be utilized in resolving questions of contract interpretation.).

Recently in *Parsons Evergreene, LLC*, ASBCA No. 58634, 18-1 BCA ¶ 37,137, we dealt with a contract interpretation dispute involving a design-build contract. Parsons argued that as the design-build contractor it had the unilateral right to change the design. We disagreed and held that language in the specifications and drawings precluded such unilateral changes. *Id.* at 180,792. However, we also held that pre-award Q&As changed that contract language, "We find that as a result of the pre-bid answers provided by the AF that conflicted with the notes on the 35% drawings, the AF bestowed upon PE the unilateral right to change Baker's double wall design to structural brick." *Id.* at 180,793. The Air Force's answers to pre-award questions changed the clear meaning of the contract.

In this decision we consider two pre-award RFIs. In RFI No. 243, a bidder cited Spec. Items 3.1 and 3.1.5 and asked whether water treatment plants (WTP) "require 24 hr/7 day a week staffing" and that "watch standing" be defined. The Navy responded: "Permits determine staffing. Permits and requirements for compliance are given by the Florida Department of Environmental Protection (FDEP). Water Permits are available from FDEP." (SOF ¶ 2) The Navy's answer further establishes the relevance of the construction permit and referenced Florida Admin. Code sections.

In RFI No. 550 a bidder cited Spec. Items 3.1 & 3.1.5 and asked "Do WTP's require 24 hr/7 day a week staffing? Define 'watch-standing.'" The Navy responded "Water Treatment Plants are to be addended [sic] per the CUP Permit #589 and #829. 'Watch Standing' is the required attendance per the CUP permit." (SOF ¶ 3) CUP Permit No. 829 authorized the FISC Fuel Depot to use water from the St. Johns River for fire protection (SOF ¶ 4). CUP Permit No. 829 had nothing to do with the Mayport WTP. CUP Permit No. 598 authorized the Naval Station Mayport to use water for a variety of purposes arguably including the WTP (*id.*). Neither of these CUP permits have anything to do with or relate to, WTP manning or "watch standing." It is hard to understand why the Navy answered RFI Nos. 243 and 550 the way it did. In responding to these two RFIs the Navy's had the opportunity to clearly state that 24/7 WTP manning was required, but did not. This is consistent with our discussion of course of dealing below.

The Navy's answers to RFI Nos. 243 and 550 do not decide our interpretation dispute as did those in *Parsons Evergreene*, but they clearly are not helpful to the Navy's interpretation. The answer to RFI No. 550 was meaningless. The answer to RFI No. 243 makes the FDEP permits and Florida State Administration Code documents relevant to our interpretation analysis.

*Course of Dealing*

Contract 7582 was awarded on December 13, 2011 (SOF ¶ 5). The first formal written Customer Complaint Record complaining that Fluor was not manning the WTP 24/7 was issued on December 19, 2014 (SOF ¶ 16). For the first two and a half years[5] of performance the Navy did not enforce 24/7 WTP manning. This establishes a clear course of dealing between the parties. We have relied upon course of dealing to interpret contracts. *Lear Siegler Services, Inc.*, ASBCA No. 54449, 05-1 BCA ¶ 32,937 at 163,174 ("Consideration of a prior course of dealing between the parties can be appropriate to aid in the interpretation of contract language.") (citation omitted), *rev'd on other grounds*, *Lear Siegler Services, Inc. v. Rumsfeld*, 457 F.3d 1262 (Fed. Cir. 2006); *C.R. Pittman Constr. Co.*, ASBCA No. 54901, 08-1 BCA ¶ 33,777 at 167,178. Fluor submitted monthly logs to the Navy that documented the hours worked by its employees[6] (SOF ¶¶ 10, 15). We hold that during this two and a half year time period the Navy knew Fluor was not manning the WTP 24/7 and did not object. This course of dealing is inconsistent with the Navy's current interpretation.

*Annex 1606000 - Water*

Annex 1606000 is organized in a table format with columns "Title," "Performance Objective," "Related Information," and "Performance Standard" (SOF ¶ 8). Relevant Specification Items are 3.1 Operation, 3.1.5 Minimum Operator Attendance and 3.1.6 Operating Records, Logs, Reports and Procedures (SOF ¶¶ 8-10). The parties agree and we hold that these are performance specifications. Performance specifications set out the performance objectives but do not specify how the contractor will achieve those objectives. *P.R. Burke Corp. v. United States*, 277 F.3d 1346, 1357 (Fed. Cir. 2002) (Performance specifications "set forth an objective or standard to be achieved, and the successful bidder

---

[5] We realize that the time between December 13, 2011 and December 19, 2014, is three years but Fluor uses two and a half years (app. November 19, 2018 mot. for partial sum. judgment at 3, 13).

[6] Fluor entered one such log for the month of August 2014 as representative of monthly logs (SOF ¶ 15). We accept that this log is representative based on the contract requirement to submit such logs monthly (SOF ¶ 10). We reject the Navy's argument that the August 2014 log was the only log submitted, (gov't December 20, 2018 resp. at 24-25).

is expected to exercise his ingenuity in achieving that objective or standard of performance, selecting the means and assuming a corresponding responsibility for that selection.").

Aside from the fact that the Navy must have been aware of Fluor's WTP manning, Spec. Item 3.1.6 Related Information required submission of a monthly Operating Records Report that included "personnel records" (SOF ¶ 10). Fluor included a representative report that included hours of attendance documenting that operators were not manning the WTP 24/7 (SOF ¶ 15). This further supports our holding above that for the first two and a half years of performance the Navy knew that Fluor was not manning the WTP 24/7 and did not object.

Spec. Item 3.1 Performance Objective required operation of the WTP so as to provide potable water "24 hours per day, seven days per week throughout the contract period" (SOF ¶ 8). Spec. Item 3.1 Related Information states that WTP operation "consists of 'watch-standing' or attendance type work by a sufficient staff of qualified persons during a specified time period" to provide proper production and distribution of potable water (*id.*). We interpret "sufficient staff" to be a classic performance standard allowing Fluor the discretion to set staffing. It cannot reasonably be read to mandate 24/7 manning to achieve the required "sufficient staff." It also states equipment "requiring operator attendance is staffed by qualified personnel at all times of operation." (*Id.*) Spec. Item 3.1 Performance Standard required Fluor to meet demand requirements 99.5% of the time (*id.*). The contract does not define how much "watchstanding," "attendance type work," or "equipment requiring operator attendance" is required. It does however require that "when WATCHSTANDING SERVICES apply" the Navy can provide the service at Fluor's expense if Fluor leaves the post "unmanned for a total of 10 minutes in any shift."[7] (SOF ¶ 7) The Navy argues that the watchstanding requirement supports its position that Fluor was required to man the WTP 24/7. The Navy gives as an example the Sodium Hypochlorite Disinfection System that it contends requires operator attendance. (Gov't March 15, 2019 reply br. at 5) As Fluor correctly points out the Navy's argument is unsupported by evidence (app. sur-reply br. at 4). Even if the Sodium Hypochlorite Disinfection System required operator attendance there is no evidence it requires attendance 24/7. We reject the Navy's argument because of lack of proof. There is no evidence that WTP equipment requires watch-standing or operator attendance 24/7.

The basic rules of contract interpretation are well known. *TEG-Paradigm Environmental, Inc. v. U.S.*, 465 F.3d 1329, 1338 (Fed. Cir. 2006) ("When interpreting a contract, the language of [the] contract must be given that meaning that would be derived from the contract by a reasonably intelligent person acquainted with the contemporaneous circumstances."). In determining reasonableness it is only necessary that the interpretation be in the zone of reasonableness. *States Roofing Corp. v. Winter*,

---

[7] Neither party has established that the contract defines what a shift must be.

14

587 F.3d 1364, 1369 (Fed. Cir. 2009) ("A contractor's reasonable interpretation need not be the best interpretation. It need only be within the zone of reasonableness."). We see nothing in Spec. Item 3.1 that can reasonably be interpreted to require 24/7 WTP manning to meet the performance standard. The Navy's interpretation is not within the "zone of reasonableness."

Spec. Item 3.1.5 Minimum Operation Attendance, Performance Objective, requires "sufficient quantities of staffing per shift" to safely operate the WTP 24/7 (SOF ¶ 9). As we did above, we interpret "sufficient quantities of staffing" to be a classic performance requirement that gives Fluor the discretion to determine staffing. It cannot reasonably be read to mandate 24/7 manning to achieve the required "sufficient quantities of staffing." As for Spec. Item 3.1.5 Performance Standard (*id.*), the Navy has not directed our attention to anything in the "operating permit, approved SOP, and Maintenance Manual" that requires 24/7 manning. Again, the Navy's interpretation is not within the "zone of reasonableness."

*Summation*

Based on the above, we have a number of things to consider in arriving at our decision. FDEP Permit No. 0146801-012-WC is a construction permit, but it requires operation of the WTP in accordance with Florida Administration Code sections Chapters 62-550, 62-555, and 62-560. As explained above, the FDEP permit and Florida Administration Codes do not require 24/7 staffing.

We take into account the Navy's answers to RFI Nos. 243 and 550. In both RFIs the Navy was asked point-blank if 24/7 staffing was required but the Navy did not respond directly. Thus, the Navy missed two opportunities to clearly inform bidders that it wanted 24/7 WTP manning. The Navy's answer to RFI No. 243 directed bidders to FDEP permits that require compliance with Florida Administration Codes that do not require 24/7 manning. The Navy's answer to RFI No. 550 referring CUP permits was just flat wrong. The Navy's answers to RFI Nos. 243 and 550 are relevant because they are inconsistent with the Navy's current interpretation of the contract's WTP manning requirements. Bidders are entitled to rely on the Navy's answers.

Next there is the two and a half year course of dealing where the Navy had no objection to Fluor's manning of the WTP. We cited case law indicating that such a course of dealing is relevant to determining a reasonable interpretation and supports Fluor's interpretation.

Finally, Annex No. 1606000 – Water Spec. Items 3.1 and 3.1.5 are performance specifications. These performance specifications give Fluor the discretion to set its manning so long as the performance objectives and performance standards are achieved. Spec. Items 3.1 and 3.1.5 cannot be reasonably read to require 24/7 WTP manning.

15

Anecdotal instances of water quality non-compliance raised by the Navy, even if true, are immaterial to the proper interpretation of the contract.

Not one of these four factors, FDEP Permit No. 0146801-012-WC, RFI Nos. 243 and 550, two and a half year course of dealing, and Annex 1606000 – Water, Spec Items 3.1 and 3.1.5 support the Navy's interpretation. We conclude that Contract 7582 did not require 24/7 WTP manning.

## CONCLUSION

For the reasons stated above we deny the Navy's motion for summary judgment, grant Fluor's motion for summary judgment and sustain Fluor's appeal with regard to entitlement. The case is returned to the parties to negotiate quantum.

Dated: August 19, 2019

CRAIG S. CLARKE
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

OWEN C. WILSON
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 61093, Appeal of Fluor Federal Solutions, LLC, rendered in conformance with the Board's Charter.

Dated:

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals